IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LAMAR M. HAUPT and            : NO. 02-2717
CAROL M. HAUPT,               :
    Plaintiffs         :
                       :
    vs.                :
                       :
THE GOODYEAR TIRE & RUBBER    :
COMPANY,                      :
    Defendant          :



VIDEOTAPE DEPOSITION OF ROBERT W. MAUTHE, M.D.
Taken in the offices of Robert W. Mauthe, M.D., 127 South Fifth Street, Suite 210, Quakertown, Pennsylvania, on Tuesday, March 11, 2003, commencing at 5:23 p.m., before Mandy L. Betz, Registered Professional Reporter, and Joe Chapman, Videographer.

APPEARANCES:

    SLOAN & FELDMAN
    By: ROBERT A. SLOAN, ESQ.
    1528 Walnut Street - Suite 1500
    Philadelphia, Pennsylvania 19102
    -- For the Plaintiffs

    FREY, PETRAKIS, DEEB, BLUM,
    BRIGGS & MITTS
    By: PETER J. DEEB, ESQ.
    1601 Market Street - Sixth Floor
    Philadelphia, Pennsylvania 19103
    -- For the Defendant

BETZ REPORTING
P.O. Box 761
Emmaus, Pennsylvania 18049
(610) 966-7881

---

INDEX TO WITNESSES

| Witness | Page |
|---|---|
| ROBERT W. MAUTHE, M.D. | |
|   By Mr. Sloan | 3, 13, 123 |
|   By Mr. Deeb | 88 |

INDEX TO EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| P-Mauthe 1 | Curriculum vitae | 4 |
| P-Mauthe 2 | Dr. Diaz' records | 30 |
| D-Mauthe 1 | Report - 9/11/00 | 92 |
| D-Mauthe 2 | One page of Dr. Diaz' records | 98 |
| D-Mauthe 3 | MRI report - 1/5/98 | 3 |
| D-Mauthe 4 | Emergency department report | 3 |
| D-Mauthe 5 | MRI report - 7/26/00 | 3 |
| D-Mauthe 6 | Office note - 1/29/03 | 107 |
| D-Mauthe 7 | Letter - 12/3/01 | 112 |
| D-Mauthe 8 | Nursing assessment | 112 |

---

3

1    (P-Mauthe Exhibit Numbers 1 and 2
2 were marked for identification.)
3    (D-Mauthe Exhibit Numbers 1
4 through 8 were marked for identification.)
5           THE VIDEOGRAPHER:  My name is Joe
6 Chapman, and I'm employed by Bill Heilman Video
7 Services, Digital Justice, 500 Philadelphia Road,
8 Easton, Pennsylvania.  The current time is 5:23 p.m.
9 And today's date is March 11th, 2003.
10           This deposition is being conducted
11 at 127 South Fifth Street, Quakertown, Pennsylvania.
12 The caption of this case is Lamar Haupt and Carol
13 Haupt versus The Goodyear Tire & Rubber Company.
14 The name of this witness is Dr. Robert Mauthe.  This
15 deposition is being taken on behalf of the plaintiff
16 represented by Attorney Robert Sloan.  Also present
17 is Peter Deeb, attorney for the defendant.  The
18 court reporter, Mandy Betz, will swear in the
19 witness.
20                  * * *
21           ROBERT W. MAUTHE, M.D., having
22 been duly sworn, was examined and testified as
23 follows:
24                  * * *
25         DIRECT EXAMINATION ON QUALIFICATIONS

---

4

1 BY MR. SLOAN:
2 Q.    Good afternoon, Dr. Mauthe.
3 A.    Good afternoon.
4 Q.    As you know, I'm Bob Sloan.  I represent
5 Lamar Haupt and Carol Haupt in this case.  And I
6 have a few questions for you today.
7     Doctor, first of all, before we
8 started the deposition we had a document marked
9 Exhibit P-Mauthe 1.  Can you tell us what that is,
10 please?
11 A.    It's my CV, which represents my
12 education and training.
13 Q.    And CV stands for curriculum vitae?
14 A.    Yes, sir.
15 Q.    And is that also known as a resume?
16 A.    Yes.
17 Q.    Okay.  Could you tell us, please, Dr.
18 Mauthe, what is your educational background?
19 A.    I graduated from the College of William
20 and Mary in Williamsburg, Virginia, back in 1980.  I
21 then completed my four years of medical school at
22 the Medical College of Virginia in Richmond,
23 Virginia, in 1985.
24 Q.    And that was an M.D. degree that you
25 got?

**45**

1  Q.     Doctor, in terms of what parts of his
2  body he was complaining of, was that pretty
3  consistent from one visit to the next?
4  A.     Always on one spot on the left side of
5  his back for the most part.
6  Q.     How about either of his legs?
7  A.     It would shoot down the leg.  But,
8  again, he -- he has this neuropathic problem in his
9  leg which made it complicated.  The -- the pain down
10 the leg is -- is a referred phenomenon, it comes
11 from the back, but he also has a problem in the leg
12 from his neuropathy which is superimposed.
13 Q.     Which leg are you talking about?
14 A.     For him it's mostly always the left leg.
15 Q.     So he had two separate problems in the
16 same leg?
17 A.     Yes.  And one pre-existed and one was
18 trauma-related.
19 Q.     Okay.  The trauma, you mean accident?
20 A.     The accident of 7/20/00.
21         Now, I think when I first saw him
22 he was 238 pounds.  By April of 2002 I had got him
23 down to 230.  So at least we were going in the right
24 direction.
25         But his exam was really unchanged.

**46**

1  At that point I said to him really, you know, you're
2  doing as well as I think you're going to do, you're
3  not going to have the surgery, I'm going to help you
4  learn to live with this, I want you to work, I want
5  you to lose weight, I want you to exercise.  So I
6  changed him to the point where I was really only
7  seeing him every three months or so.
8          I saw him again in July of 2002,
9  again in October of 2002, and my most recent visit
10 being on January 29th of 2003.  Nothing really
11 has -- has changed much.  He's really having trouble
12 losing the weight.  I have him really on only
13 over-the-counter medications at this time, ibuprofen
14 and Tylenol.  I have him on a home program, and I
15 gave him permanent restrictions.  And the only way I
16 think that anything's going to really change is if
17 he's able to just exercise and become more fit and
18 overcome what has happened.
19 Q.     And, doctor, I'm sorry, the date of the
20 visit preceding the most recent visit of January
21 29th, 2002?
22 A.     10/14/02.
23 Q.     Right.  And then the last one was
24 January 29th, 2003?
25 A.     Yes, sir.

**47**

1  Q.     Okay.  Thank you.
2  A.     And that's where we are today.
3  Q.     Doctor, in a moment I'm going to ask you
4  some professional opinion questions.  I'll request,
5  please, doctor, that you -- to the extent that you
6  can, you base your answers to the opinion questions
7  on a reasonable degree of medical certainty even if
8  I forget to put those magic words in each of my
9  questions.  Is that agreeable?
10 A.     Let me say that every opinion that I
11 will render today will be within reasonable degree
12 of medical certainty.
13 Q.     And if you're unable to do that, you
14 will let us know?
15 A.     I'll let you know.
16 Q.     Thanks very much.  Doctor, I'm also
17 going to give you a hypothetical which I will try to
18 move through as quickly as possible.  The
19 hypothetical being a summary of what I expect Mr.
20 Haupt to testify to at trial.  I'm at a bit of a
21 disadvantage since we're doing this videotape before
22 the start of the trial, so I don't know exactly word
23 for word what he will say at trial, but based on the
24 information I do have available, I'm going to try to
25 anticipate what -- what his testimony will be, at

**48**

1  least in basic substance.  Pardon me.
2  A.     I'm sorry I can't be there live.  I
3  just -- I have 25 patients to see a day and I
4  just -- I can't do it.
5  Q.     I understand, doctor.  In any event, it
6  will be hopefully the next best thing.  Doctor, I'll
7  ask you to assume that Mr. Haupt will testify that
8  before July 20th, 2000 that he had experienced
9  episodes of back pain; that is, that he had back
10 pain but it was not constant, rather it came and
11 went.
12         MR. DEEB:  Objection.
13         THE VIDEOGRAPHER:  Off the video
14 at 6:14.
15         (The following discussion was held
16 off the video record.)
17         MR. DEEB:  I'm going to object to
18 the rendering by counsel of what Mr. Haupt will
19 testify to given that he hasn't testified as Mr.
20 Sloan has noted.  I think that Mr. Haupt has
21 presented the doctor with the factual background
22 necessary for his treatment and for the opinions
23 that he has.  And providing him with a suspected
24 rendition of facts, what we don't know yet what
25 those facts are going to be from the time of trial,

Page 49

is unreasonable and not reliable and should not be permitted to go forward and be placed into evidence. That being said, we can go forward.
      (Back on the video record.)
      THE VIDEOGRAPHER: Back on the video at 6:15.
BY MR. SLOAN:
Q.      Now, Dr. Mauthe, I'll ask you to assume that he will also testify that before July 20th, 2000, he -- he -- although he had leg symptoms, he did not have pain that went from his low back into his buttocks and down from the buttocks into the leg. The other symptoms that he had in his leg being electric shock sensation or burning or numbness, a tingling or a cold sensation. I believe he will also indicate when he testifies that he cannot recall missing time of any significance due to back problems before July 20th, 2000. He will also indicate, I believe, that -- that he -- before that date he was able to do the full range of his job duties as an over-the-road truck driver without a problem.
      I believe he will also tell us about a motor vehicle accident that he was in on July 20th, 2000. Specifically, I believe he'll

Page 50

indicate that he was driving a tractor-trailer for his employer. He was down in Orlando, Florida. And at the time of the accident he was stopped at a red light. He will, I believe, indicate that he was rear-ended by a straight body truck, a Mack truck. I believe he will also indicate that -- that due to that impact there was damage to the rear of his trailer. There was also damage to the front of the Mack truck. And he will also indicate, I believe, that the seat back of his seat in -- in his tractor broke off upon impact, causing him to fall backwards.
      I'll also ask you to assume that he will testify that because he was responsible for his truck and the load and also a return load that he had to pick up to bring back to Pennsylvania, that he basically held off on -- on getting treatment. It took him approximately a couple days or so to do what he had to do and get back to Pennsylvania.
      I believe he'll indicate that he was in pain during that return trip from Florida to Pennsylvania and that once he got back, he immediately sought medical care from Gnaden Huetten, also known as Lehighton Hospital, on July 22nd,

Page 51

2000.
      Doctor, I ask you to also assume that he will testify that following the July 22nd, 2000 accident, that he perceives his back pain -- he felt his back pain was worse in a couple ways; that he had had some back pain before, but that now it was constant and also rather than episodic, or rather than coming in episodes, and also it was more severe. I believe he will also indicate that he had some new problems in his left leg, or he felt that he had, which were different than what he had before. I believe he'll indicate that he now felt that he had pain going from the left side of his low back traveling into the left buttock and then down into the leg.
      I believe he will also testify that following the July 22nd, 2000 accident he did try a number of times to try and go back to being an over-the-road truck driver. And I also anticipate he'll tell us about the duties of that job. He'll indicate that it involved typically driving for many hours every day, up to as much as ten hours a day, which was a maximum amount that he would be allowed to drive. And it also involved nondriving work as well, again, different loads, different destinations

Page 52

required different things, but it consisted of those types of duties.
      I believe he'll indicate that the job typically involved sitting for many hours at one time in the truck. And I believe he'll also indicate that, you know, on particular occasions when he had to get somewhere without delay, that he could sit sometimes as long as eight hours in the truck at one shot. I believe he'll indicate more typically he might spend as much as four hours at one time in the truck driving. I believe he'll also indicate that if he were to get out of the truck frequently, he wouldn't be able to get his job done on time.
      I anticipate that he will testify that usually he did not have to actually handle the load, the merchandise that he was carrying in the truck, but that from time to time he did. And on those occasions he was required to do that as part of his job. I believe he'll tell us at least some examples of the types of things that from time to time he had to handle, and I believe they may include things such as bags of pet food weighing anywhere from approximately 30 to 50 pounds. And when he would have to do that, he might have to move

**Page 53**

approximately 100 bags. I believe he'll indicate boxes of citrus and other produce that could weigh 25 pounds, and he might have to move several hundred boxes on one occasion. He may indicate that he had to move cases of yogurt that might weigh about 20 pounds, and he would have to move hundreds of those. I believe he'll indicate that sometimes he would have to move watermelons and -- and they might average about 10 pounds in weight, and he would have to move hundreds of those at one time, moving them from one place and stacking them elsewhere.

Doctor, I believe he'll also indicate that from time to time he had to move a pallet. That's a -- that's a wooden platform on which merchandise is stacked. And he would use a pallet jack, a hand pallet jack, to do that. It's a little device with a handle on it that would slip under that platform and he would pull on the device and it would in turn move the pallet. It's not motorized. And he would -- I believe he'll indicate that sometimes he would have to pull a load on a pallet that could weigh as much as approximately one ton.

Doctor, I believe he'll indicate that following the accident and being in and out of

**Page 54**

his truck driver work, that he finally stopped officially in April of 2001. I believe he'll indicate it was just too painful, and finally at that point in time he officially called it quits as a truck driver.

I believe he will testify that after that he did start a job as a security guard. I believe he'll indicate that -- that he continued to have pain while working in that job, but that he was able to handle the duties of that job. I believe he'll indicate that his assignments as a security guard would vary, depending on the assignment, he could be assigned to different locations, but that regardless of the assignment, that his work as a security guard does allow him to change position often, either going from sitting to standing or walking or going from standing and walking to sitting. And that he's able to make those changes in position even if the particular assignment happens to be foot patrol or another day happens to be a car patrol. Basically I believe he'll indicate that he's not stuck doing one thing for hours at a time. I believe he'll also indicate that there's not much lifting -- pardon me -- involved in the job, the security guard job. Off

**Page 55**

the record one second, please.

THE VIDEOGRAPHER: Off the video at 6:22.

(Discussion held off the record.)
(A brief recess was taken.)

THE VIDEOGRAPHER: Back on the video at 6:23.

BY MR. SLOAN:
Q. Dr. Mauthe, having said all that, do you have an opinion to a reasonable degree of medical certainty as to whether Mr. Haupt had any pre-existing condition as of July 20th, 2000, at least as regards his -- his back and his legs?

MR. DEEB: Objection.
THE VIDEOGRAPHER: Off the video at 6:24.

(The following discussion was held off the video record.)

MR. DEEB: I believe I've already objected to the reading of the assumed facts based upon the proposed testimony of Mr. Haupt. Obviously my objection continues, and I'm not going to continue to interrupt. But to the extent that you ask him for any opinion based upon that rendition of facts which you just presented, I object to it as

**Page 56**

being based upon evidence which is not reliable, not of record, and is not appropriate for the trial.

(Back on the video record.)
THE VIDEOGRAPHER: Back on the video at 6:24.

BY MR. SLOAN:
Q. Do you recall the question, doctor?
A. Yes. And the answer is yes, I have an opinion.
Q. Could you tell us what that opinion is, please?
A. Yes. It's my opinion that Mr. Haupt has a pre-existing condition as it pertains to his lumbar spine, best described as an asymptomatic spondylolisthesis. I also believe he suffers from peripheral neuropathy, among other things not pertinent to today's discussion.
Q. And the -- when you say asymptomatic, did he have any discomfort or pain in his back before July 20th, 2000 from the spondylolisthesis?
A. When I looked at Dr. Diaz' records -- and I don't know how many pages there are, maybe there's 20 pages -- there's about 50 entries, whether it's for his blood pressure or dizziness or a sore throat or peed too little or peed too much.

Page 57

There are a lot of entries. He goes to the doctor a lot.

And I counted -- I don't remember the exact number. Some were for the leg, some were for the back, some were for both. And I think there are about ten visits out of that 50 that he complained of back pain and maybe about three or so where he complained of leg pain. So, you know, this problem pre-existed. And I think that there was a -- you know, substantial evidence in terms of MR and x-ray that showed he has this pre-existing spondylolisthesis. However, it's my contention that as of 7/20/00 there was an increase in his pre-existing back pain such that the focus of his medical care became for his back. So he increased the frequency, increased the quality, increased in character of his complaints, sought additional medical consultation.

As far as I know, no one ever talked to Mr. Haupt about having spine surgery before, despite the fact that this pre-existed. So I think that there was -- there was a change in the quality and the character of the complaints, an increase in the medical services, which led to an aggra -- which is best summarized by saying he

Page 58

aggravated this pre-existing condition which became turned from -- I think the best way to say is he went from episodic to continuous, from nonimpairing to impairing.

Q. Doctor, and those 50 visits with maybe ten where there's references to the back and/or the leg, those are spread out over a period of how many years?
A. Ten.
MR. DEEB: Objection.
THE VIDEOGRAPHER: Off the video at --
A. Twenty years. Sorry. Go ahead. I'll wait.
Q. From 1982 to 2000?
MR. DEEB: Are we off the record?
THE VIDEOGRAPHER: Off the video at 6:27.
(The following discussion was held off the video record.)
MR. DEEB: The nature of my objection is that Mr. Sloan indicated that there were ten that were related to the back and/or the leg, whereas I understood the testimony to be ten relating to the back and five or so relating to the

Page 59

leg.
THE WITNESS: Three.
MR. DEEB: Whatever. You stated five, but it may be three. I have no idea. In other words, ten is an inappropriate representation as to the testimony prior given. We can go back on the record when Mr. Sloan is ready.
(Back on the video record.)
THE VIDEOGRAPHER: And back on the video at 6:28.
BY MR. SLOAN:
Q. Doctor, you indicated -- and I may have misquoted you on that, but you indicated that there were approximately 50 visits. And out of those, there were a certain number of visits where there were complaints of back complaints or some leg complaints. Rather than misstate what you said, I'll just leave the record as it is. But those -- those visits that you're talking about, the 50 are spread out over what time frame?
A. From 1982, so it will be 20 years. I think I said ten years.
Q. So if we substitute 2000 would it be 18?
A. About 2001, yes. You can't hold me to ten. I counted before we sat down here today. And

Page 60

I -- but I may have missed one or two.
Q. That's close, ball park?
A. Close. You got to give me a little standard deviation of error there.
Q. I'm mainly interested, doctor, in the ones that go from the time he first sees Dr. Diaz until July -- well, until -- up until the time of the accident. Is that the time frame that those are in?
A. Yes, sir. It's occasional.
Q. Okay. Now, doctor, you may have partially anticipated my next question. But do you have an opinion to a reasonable degree of medical certainty as to what effect, if any, the July 20th, 2000 motor vehicle accident had on Mr. Haupt's pre-existing condition?
A. Yes, I have an opinion.
Q. Your opinion, please.
A. And it's my opinion within reasonable medical certainty that the forces involved in the trauma sustained on 7/20/00 caused a previously fairly quiescent spondylolisthesis to become continuously symptomatic, which precluded his ability to return to his previous level of employment and, in fact, had him see a surgeon who

**Page 61**

1  offered him a stabilization procedure.
2  Q.        Again, doctor, you may have partially
3  anticipated my question.  But do you have an opinion
4  to a reasonable degree of medical certainty as to
5  what symptoms, if any, Mr. Haupt suffers from that
6  aggravation of his pre-existing spondylolisthesis?
7  A.        The symptoms are what the patient
8  complains of.  And with Mr. Haupt it's increased
9  back pain; frequency in character; difficulty
10 sitting, standing, walking or bending to any
11 significant degree; and the pain that shoots down
12 the left leg on occasion.  Although, there is an
13 overlap with his neuropathy, which is more of a
14 shooting, lightning needle-like sensation as opposed
15 to the deep achy referred pain through the buttock
16 and down the leg.
17 Q.        Okay.  And which is the one that you
18 believe is from the aggravation?
19 A.        More of the dull, achy, buttock leg.
20 Anything that has to do -- when he uses words like
21 pins and needles or shocks, that's the neuropathy.
22 Q.        Dr. Mauthe, do you have an opinion to a
23 reasonable degree of medical certainty as to whether
24 Mr. Haupt needs any limitations on work and other
25 physical activities?

**Page 62**

1  A.        Yes, I do.
2  Q.        Your opinion, please.
3  A.        And it's my opinion within reasonable
4  medical certainty that Mr. Haupt should be relegated
5  to light duty type work.  That is because if there
6  is excess sitting, excess bending, or excess
7  lifting, there will be increased amount of force
8  transmitted to the spine, increasing pain.  May
9  force Mr. Haupt to decide to undergo the surgery
10 which I'm trying to avoid.  And so I give him
11 limitations to avoid hurting himself, pushing him
12 into surgery, and I don't allow him to go back into
13 his truck driving job.
14 Q.        Doctor, let me go over that a little bit
15 with you.  When you said excess sitting, for
16 example, how much would you allow him to sit at one
17 time?
18 A.        Thirty minutes at a time.  What happens
19 is when you sit, there's pressure on the spine.  So
20 we recommend -- or I recommend to my patients they
21 need to change positions frequently.  And we usually
22 use about a half hour as the sitting tolerance
23 time --
24 Q.        Doctor, would you impose --
25 A.        -- as opposed to the almost two hours --

**Page 63**

1  or hour and a half we've been sitting here.
2  Q.        Well, we could get up if you need to.
3  A.        Well, I've gotten up once or twice.
4  Q.        If you need to, you'll let us know,
5  right?
6  A.        Right.
7  Q.        Okay.  Doctor, would you impose any
8  limit upon him in terms of, say, the total amount of
9  sitting, if we added it all up in an eight-hour
10 workday?
11 A.        I would limit him to about half of the
12 day, so four hours out of eight hours he could sit
13 provided he changed position every half hour or so.
14 Q.        Doctor, would you place any limits upon
15 him in terms of driving?
16 A.        Again, the same with sitting, 30 minutes
17 at a time.  I mean, and that's not an absolute.
18 It's a guide or a ball park.
19 Q.        And also --
20 A.        Total of four hours.
21 Q.        Okay.  Doctor, you mentioned excess
22 lifting.  Do you have any more specific
23 recommendation in terms of number of pounds?
24 A.        When I say light duty, I don't want a
25 lot of lifting involved so that there's no force

**Page 64**

1  transmitted to the spine.  Ten pounds is pretty
2  negligible, so he can lift that all he wants, but I
3  wouldn't let him lift more than 20 pounds except on
4  an occasional basis, meaning about a third of his
5  day.
6  Q.        How about bending?
7  A.        Limit to occasionally.
8  Q.        Doctor, what about -- about walking?
9  A.        Well, walking is actually therapeutic
10 for him.  As a matter of fact, that's part of what I
11 have him on is a 30-minute walking program once or
12 twice a day.  So I think that that's therapeutic,
13 but, again, I don't know how long he could sustain
14 it for.  So we're going to keep most activities
15 involved to about 30 minutes at a time.
16 Q.        How do you feel about standing in one
17 place as compared with walking?
18 A.        Standing in one place is tough for
19 anybody without shifting around, but, again, you
20 know, 30 minutes is fine.
21 Q.        Well, is it any tougher for him than for
22 people that don't have his problems?
23 A.        I think it's hard for anybody to stand
24 in one place for a long period of time.  Anybody
25 who's ever been to Disney World knows that.  But,

**Page 65**

1 you know, with the spondylolisthesis, the muscles go
2 into spasm, makes it more difficult.
3 Q.  Now, doctor, do you have an opinion as
4 to whether he can work within these limits, or can
5 do a job as long as he stays within these limits?
6 A.  Well, what I do is I determine medical
7 impairments. Keeping in mind, of course, that
8 disability is not a medical determination, it's
9 actually a legal one. And, you know, everybody
10 interprets pain differently. So I can't guarantee
11 that he's going to be without pain. But what I can
12 tell you is that with that diagnosis, he is safe to
13 work within the limitations I have specified. It
14 doesn't mean he's not going to have discomfort, but
15 I think it's reasonable.
16 Q.  Okay. And, doctor, do you have an
17 opinion to a reasonable degree of medical certainty
18 as to whether these limitations that you've
19 recommended are permanent?
20 A.  Yes. It's my opinion within reasonable
21 medical certainty that they are permanent based on
22 the significant amount of time this has persisted
23 without letting up.
24 Q.  Doctor, do you have an opinion as to
25 whether these limitations are the result of the

**Page 66**

1 aggravation of his pre-existing condition by the
2 July 20th, 2000 motor vehicle accident?
3 A.  Yes. It's my opinion that the
4 limitations we've just discussed are a direct result
5 of the accident sustained on 7/20/00 and the ensuing
6 aggravation of his pre-existing lumbar
7 spondylolisthesis.
8 Q.  In your opinion, did he need any such
9 limits before the accident?
10 A.  To my knowledge, although he had some
11 occasional back pain, I never saw any physician
12 impose any limitations. There are no reason --
13 there is no reason to impose limitations on an
14 asymptomatic spondylolisthesis.
15 Q.  Doctor, do you have an opinion to a
16 reasonable degree of medical certainty as to whether
17 Mr. Haupt is able to do the full range of his duties
18 as an over-the-road truck driver?
19 A.  It's my opinion within reasonable
20 medical certainty that he's unable to return to his
21 former occupation as a full-time, over-the-road
22 tractor-trailer driver due to the fact of the
23 prolonged sitting involved, sometimes obtaining that
24 crouched, bent-over posture, the lifting which was
25 occasionally involved in his job which may be in

**Page 67**

1 excess of his limitations. So therefore, I don't
2 believe it's appropriate for him to return.
3            And the other concern I have is he
4 gets these spasms in his back. And I have to not
5 only be concerned for Mr. Haupt but the other people
6 on the road. And I honestly don't think he's safe
7 to operate a vehicle like -- like a tractor-trailer.
8 Certainly a car is okay.
9 Q.  Doctor, do you have an opinion as to
10 whether that inability to do his old job as an
11 over-the-road truck driver is the result of the
12 aggravation by the July 2000 motor vehicle accident?
13 A.  Yes. It's my opinion that his inability
14 to return to his previous -- previous occupation as
15 an over-the-road tractor-trailer driver is a direct
16 result of the trauma sustained on 7/20/00 and the
17 aggravation of his spondylolisthesis.
18 Q.  Doctor, I believe we may hear some
19 testimony at trial about Mr. Haupt's having explored
20 the possibility of working as a -- at a job called a
21 yard jockey. Have you heard of that job?
22 A.  Yes.
23 Q.  Okay. And do you understand that to be
24 driving a tractor and moving trailers around in a --
25 in a yard?

**Page 68**

1 A.  That's the majority of it, but you also
2 have to -- depending on whether you're assigned to
3 hook up the trailers, you may have to work with the
4 jacks, the cranks as they call them, pulling the
5 pins.
6 Q.  And, doctor, would you want Mr. Haupt to
7 be cranking, say, the landing gear I believe there
8 will be testimony or pulling pins?
9 A.  Is that what they call it, landing gear?
10 I think it would require excess force, a bent-over
11 flexed posture for a prolonged period of time, and
12 therefore would not probably be appropriate -- would
13 not be appropriate within reasonable medical
14 certainty for Mr. Haupt.
15 Q.  Doctor, do you have an opinion as to
16 whether the aggravation of Mr. Haupt's pre-existing
17 condition caused by the motor vehicle accident is a
18 substantial contributing factor to his symptoms and
19 limitations?
20           MR. DEEB:  Objection.
21           THE VIDEOGRAPHER:  Off the video
22 at 6:37.
23           (The following discussion was held
24 off the video record.)
25           MR. DEEB:  Objection to the form

Page 69

as leading the witness. I've let a number of leading questions go because the opinions are already well of record, but now it's starting to push beyond the reasonableness level, I believe. You can go back on the record.
    (Back on the video record.)
    THE VIDEOGRAPHER: Back on the video at 6:37.
BY MR. SLOAN:
Q. You can answer, doctor.
A. The answer is yes. It's my opinion within reasonable medical certainty that the trauma sustained on 7/20/00, when he aggravated his pre-existing spondylolisthesis, was the substantial and material contributing factor which led to the back pain, inability to return to work, and his limitations in his usual and customary and daily life activities.
Q. Dr. Mauthe, what is a prognosis?
A. It's a guess for the future.
Q. And can you render a prognosis based upon reasonable medical certainty?
A. Yes. It's my opinion within reasonable medical certainty that his prognosis is for continued pain. The fairly quiescent

Page 70

spondylolisthesis has become constantly painful, and I foresee it to be painful into the future.
Q. Do you believe it's permanent?
A. Yes, sir.
Q. Doctor, do you believe that the security guard job is appropriate for him?
A. I think it's not only appropriate, I think it's therapeutic, yes.
Q. Doctor, do you have an opinion as to whether the treatment that Mr. Haupt has received for the aggravation of his condition by the motor vehicle accident -- and by treatment I include the treatment you've given him as well as the treatment rendered by other health care providers -- do you have an opinion about whether that treatment is reasonable and necessary?
A. Yes.
Q. And your opinion, please.
A. It's my opinion within reasonable medical certainty, based on my years of training and experience in treating many patients with this same problem, that the care he has received has been both reasonable and necessary for the injury sustained on 7/20/00.
Q. Now, doctor, do you have a -- a record

Page 71

of your charges for your own treatment of Mr. Haupt?
A. Yes.
Q. And can you tell us what the total is?
A. Maybe. I asked them to print it out ahead of time before we came in. I certainly have never looked at it. Total charges from my care was -- it looks like $1,239.88.
Q. And, doctor, are those charges for the services that you gave to Mr. Haupt, are those the charges that are -- do you believe those charges are fair and reasonable and those that are customary?
A. Well, in my field they're all regulated. For example, although we charge, you know, a certain amount, we only receive what's approved by the -- the fee schedule. So I think they're reasonable and necessary, yes.
    MR. SLOAN: Okay. Let's go off the record for one second, please.
    THE VIDEOGRAPHER: Off the video at 6:40.
    (Discussion held off the record.)
    (The following discussion was held off the video record.)
    MR. SLOAN: I believe we have a stipulation, Mr. Deeb, that it's agreed that whether

Page 72

or not the charges, Dr. Mauthe's charges or other physicians' charges, are admissible will be determined at a later time, so that the objection to that is preserved. Also, the issue of whether or not the treatment that Mr. Haupt received is or is not related to the July 2000 accident will also be, of course, a question that will be answered later, most likely by the jury. But do we have an agreement that the charges of the various health care providers, including Dr. Mauthe, are fair, reasonable, and customary?
    MR. DEEB: Correct.
    MR. SLOAN: And we're agreeing that we're not going to object based on authenticity of medical records?
    MR. DEEB: That's correct. I don't see any situation where I have a problem with authenticity at the moment.
    MR. SLOAN: Thank you.
    (Back on the video record.)
    THE VIDEOGRAPHER: Back on the video at 6:42.
BY MR. SLOAN:
Q. Dr. Mauthe, do you have an opinion to a reasonable degree of medical certainty as to whether

Page 73

1  Mr. Haupt as a result of the July 20th, 2000
2  accident has suffered a significant and permanent
3  loss of an important bodily function?
4  A.      Yes, I have an opinion.
5  Q.      And your opinion, please.
6  A.      That he has, within a reasonable degree
7  of medical certainty, lost significant important
8  bodily function, and that is to say, the ability to
9  sit, participate in full and unrestricted
10 employment, lift, and bend.  So therefore, the
11 accident did take a piece away that he no longer
12 has.
13 Q.      And, doctor, it may be a silly question,
14 but do the limitations that you recommended apply to
15 activities other than work, such as home activities?
16 A.      Well, certainly.  I think they apply in
17 both cases.  He has limitations in bending, lifting,
18 sitting, standing, and walking.
19 Q.      Doctor, another hypothetical.  I'll ask
20 you to assume that when Mr. Haupt testifies he will
21 indicate that before the July 20th, 2000 motor
22 vehicle accident he engaged in activities outside of
23 work such as helping with housecleaning;
24 specifically, he would move the furniture.  I
25 believe he'll indicate he shoveled snow, mowed the

Page 74

1  grass, trimmed shrubs, washed and -- and provided
2  limited service on his vehicles, engaged in limited
3  carpentry, plumbing, and electric work around his
4  house.  He did some domestic chores.  And I believe
5  he'll indicate that he would spend approximately, on
6  the average, anyway, about five hours a week
7  performing such services.
8           I believe he will also indicate
9  that after the July 20th, 2000 motor vehicle
10 accident, due to the physical problems that he's had
11 since the accident, he still engages in those --
12 such tasks, but that he can only do it for
13 approximately one to two hours per week.
14          Doctor, do you have an opinion to
15 a reasonable degree of medical certainty as to --
16 assuming he testifies in that manner, whether the --
17 that reduction in hours is consistent with his
18 medical condition as you know it?
19          MR. DEEB:  Objection.
20          THE VIDEOGRAPHER:  Off the video
21 at 6:45.
22          (The following discussion was held
23 off the video record.)
24          MR. DEEB:  Again I object to the
25 hypothetical which poses the proposed testimony of

Page 75

1  Mr. Haupt as opposed to the actual testimony or
2  actual information that has been provided to the
3  doctor.  And I -- note my continuing objection to
4  any opinion the doctor offers as a result of that
5  hypothetical.
6           (Back on the video record.)
7           THE VIDEOGRAPHER:  Back on the
8  video at 6:46.
9           THE WITNESS:  Yes.  It's my
10 opinion that he will have limitations in terms of
11 his activities of daily living just as he would have
12 in terms of work as you have described them.  And
13 that is as a direct result of the trauma sustained
14 on 7/20/00.
15 BY MR. SLOAN:
16 Q.      Dr. Mauthe, I want to explore a little
17 bit your thinking that you expressed.  Mr. Haupt had
18 some back pain before his July 20th, 2000 motor
19 vehicle accident.  How is it that you can say that
20 it's different afterwards?
21 A.      Well, I didn't know Mr. Haupt before.  I
22 only met him after this event occurred.  I think
23 what you do is when you're going to render opinions
24 like this, you look at the -- look at the facts of
25 the case, look at how often he was seen for back

Page 76

1  pain before, look at the diagnostic testing, and
2  look and see if there's what's called a temporal
3  relationship; in other words, did he seek medical
4  care months after this event occurred or was it
5  promptly, within a reasonable period of time.
6           And I think the fact that he drove
7  his truck back and was then seen in an emergency
8  room two days later and then the family doctor two
9  days later and has been continuously symptomatic
10 since as opposed to in the past when he was just
11 occasionally symptomatic shows that there is what's
12 called a temporal relationship.
13          The second form of causation or
14 analytical thinking involve what's called
15 biomechanics.  And although I'm not an engineer, in
16 medicine when we have a bony defect, we call it
17 sometimes an accident waiting to happen.  I mean,
18 sometimes these traumas do occur to pre-existing
19 conditions and cause them to become symptomatic and
20 cause them to be more severe, such that if they
21 weren't there, maybe the trauma would not have
22 resulted in pain.  And when you're struck from the
23 rear and the body is forced, depending on how the
24 actual mechanics occurred, it's reasonable to
25 aggravate that type of -- of -- of spine condition.

**Page 77**

1            So I think given the fact that
2  there's a temporal onset, you know, he sought
3  medical care afterwards within a reasonable period
4  of time, the biomechanics of the injury make sense,
5  and he's been continuously symptomatic since, I
6  think that's how you explain it.
7  Q.        And, doctor --
8  A.        And the bottom line is, though, you
9  either believe somebody or you don't.  You know, I
10 have no reason to doubt.  I don't question pain.
11 Pain is always subjective.  My job is to determine
12 if there's an impairment present.  And I think after
13 all we've been going through for almost two hours
14 now, there's sufficient evidence to indicate he has
15 a significant medical impairment limiting one's life
16 daily activities.
17 Q.        Doctor, you told us about the frequency
18 of treatment before the accident and you referenced
19 Dr. Diaz's records.  Is the treatment that he got
20 since the accident for his back, has that been with
21 the same frequency or different frequency?
22 A.        Well, he never had injections before,
23 never saw a surgeon before, never saw a physiatrist
24 or a specialist that I know of, so I think there's
25 been a significant change.

**Page 78**

1  Q.        And what effect, if any, does that have
2  on your opinion that he aggravated his back in that
3  accident?
4  A.        Well, I think it all goes into the --
5  the big picture.  You have to look at each item
6  individually and see how it fits.
7  Q.        Dr. Mauthe, in terms of what was seen on
8  the films before and after the accident, is there
9  any noticeable anatomic change comparing the films
10 before and after?
11 A.        Well, the reports themselves didn't
12 really shed any light into that.  I looked at them
13 myself.  Now, I don't have this MRI from '98, so I
14 can't compare an MRI in '98 to the one in 2000.  But
15 it's not uncommon for there not to actually be a
16 structural change.  For example, it's very rare for
17 someone to go from a grade one to a grade two.  It
18 happens.  But usually they just become symptomatic.
19 That's I think what happened here.
20 Q.        And you can have that -- becoming
21 symptomatic even in the absence of noticeable
22 anatomic change on films?
23           MR. DEEB:  Objection.
24           THE VIDEOGRAPHER:  Off the video
25 at 6:50.

**Page 79**

1            (The following discussion was held
2  off the video record.)
3            MR. DEEB:  The question is
4  leading.
5            (Back on the video record.)
6            THE VIDEOGRAPHER:  Back on the
7  video at 6:50.
8            MR. SLOAN:  Strike that question.
9  BY MR. SLOAN:
10 Q.        Doctor, let me ask you a different
11 question.  Does -- does the fact that there's no
12 anatomical change seen looking at the early films
13 with the post accident films, does that negate your
14 opinion that he aggravated his back?
15 A.        When you look at diagnostic studies, you
16 have to understand there are limitations.  And that
17 has to do with what's called sensitivity.  We're
18 looking at x-rays and MRI scans that aren't perfect,
19 and it's very hard to detect subtle changes.  So
20 it's not unusual at all for there not to be any
21 significant changes on the x-rays or MRIs.  So that
22 doesn't change any of my opinions.
23 Q.        Doctor, does the fact that Mr. Haupt
24 spent two days traveling from Florida to
25 Pennsylvania before going for treatment, does that

**Page 80**

1  have any effect on your opinions?
2  A.        No.  I think most people try to give
3  something time to resolve and see if it goes away.
4  He also had a job to do.  He had to get his truck
5  back.  I'm more concerned with the people that, you
6  know, rush to doctors when something happens.  He
7  gave it a period of time and it didn't resolve.
8  Q.        And, doctor, do you have an opinion as
9  to whether Mr. Haupt's going in and out of work from
10 the time of the accident until he officially left
11 truck driving in April 2001, whether his absences
12 from work due to these problems was medically
13 appropriate?
14 A.        I didn't treat him during that period of
15 time, so I don't really know what his condition
16 was -- was other than to read the records of
17 doctors.  But I think it's reasonable to try it.  I
18 mean, how do you know if you can do it until you
19 try.  So I think, again, it goes to a credibility
20 factor.
21 Q.        It was reasonable also to have to take
22 some time off during that time period from truck
23 driving?
24 A.        Well, again, I didn't -- I didn't know
25 what he was like back then.  So we'll have to defer

**81**

to the medical records in that time period, if he hurt as bad as he said he did and he couldn't do the job and he felt unsafe. I mean, this is not somebody who's sitting in a shop all day. You're driving a very heavy vehicle with other peoples' lives at stake. So I'll have to defer to his judgment during that period of time.
Q. Well, assuming, doctor, that the jury were to believe his testimony and assuming he testifies that during that time period it was painful, such that he sometimes had to leave work, would that be consistent with your knowledge of his medical condition based on your review of the earlier records?
    MR. DEEB: Objection.
    THE VIDEOGRAPHER: Off the video at 6:52.
    (The following discussion was held off the video record.)
    MR. DEEB: Objection. The question poses a hypothetical which is not yet in evidence and the assumption that the jury believes the testimony which is not yet in evidence, both of which are improper foundations for the question being asked the doctor at this time.

**82**

    (Back on the video record.)
    THE VIDEOGRAPHER: Back on the video at 6:53.
    THE WITNESS: Yes. I think it was reasonable for him to miss some time from work based upon his severe complaints of pain.
BY MR. SLOAN:
Q. Now, doctor, do you have an opinion as to whether it -- it can be said that without that motor vehicle accident his spondylolisthesis would have ended his truck driving job prematurely anyway; and by prematurely, I mean before age 65?
A. We'll never know the answer to that question. Something else could have happened. People get hurt at home. They're not just in car accidents. So I'll never be able to say. It looked like he was going along pretty well. He had it since '89 and he hadn't lost any time from work, so it looked like it wasn't a problem then. So I think based on if you look at the past, he would have continued to work into the future.
Q. And, doctor, do you have an opinion as to whether it can be said that either his weight or his other medical problems, the ones you mentioned he went to Dr. Diaz for, whether those factors would

**83**

have ended his truck driving career before age 65?
    MR. DEEB: Objection.
    THE VIDEOGRAPHER: Off the video at 6:54.
    (The following discussion was held off the video record.)
    MR. DEEB: Objection as to the scope, as this being beyond the scope of his testimony and being beyond the scope of his expertise.
    (Back on the video record.)
    THE VIDEOGRAPHER: Back on the video at 6:54.
    THE WITNESS: Again, certainly anything can happen. I mean, he could have had a heart attack. He could have had a stroke. So anything could have terminated his -- his truck driving ahead of time. We'll never know the answer to that. Those are certainly risk factors. But, again, he was working along just fine.
BY MR. SLOAN:
Q. Dr. Mauthe, did you have the opportunity to review a report from Dr. Resnick, Edward Resnick?
A. Yes.
Q. And was that a report dated December

**84**

10th, 2002?
A. Yes.
Q. Do you have that report handy, doctor?
A. Yes.
Q. Okay. And at whose request was Mr. Haupt evaluated by Dr. Resnick?
A. I believe it would be Attorney Deeb's office.
Q. And, doctor, do you have any areas of agreement or disagreement with the opinions of Dr. Resnick as stated in that report?
A. Well, I would say we both looked at the same records. And I think the only real point that we would disagree on is that he said that this man has had many episodes of low back pain. I don't know if 10 or so episodes in 20 some odd years or maybe 18 years is -- is many.
    I think we can certainly agree that the spondylolisthesis was pre-existing. And he indicated that he thought the accident caused a soft tissue injury. My only point would be that soft tissue injuries usually resolve within three to six months, whereas this did not. So I think his current episodes of pain and his impairment, his inability to return to work is a direct result of

85

1  that aggravation of that spondylolisthesis, where
2  you tip the scales in the other direction and it
3  just makes itself that they can't tolerate it.
4  Q.        And, Dr. Mauthe, again, I assume that
5  Dr. Resnick will testify as to opinions in his
6  report. Do you agree with his opinion regarding the
7  neuropathy being the cause of the symptoms in Mr.
8  Haupt's leg, assuming that he meant that that's 100
9  percent of the cause of the symptoms in the leg?
10 A.        Well, he clearly had left leg symptoms
11 before of a shock-like neuropathic quality and they
12 pre-existed, but the more constant radiation through
13 the buttock and down the back is fairly classic with
14 spondylolisthesis. So I think there's a
15 contribution from both at this time.
16 Q.        Now, doctor, is there any other doctor
17 who evaluated Mr. Haupt for legal reasons, that is,
18 for -- for reasons other than treatment besides Dr.
19 Resnick?
20 A.        Well, we talked about Dr. Wukich earlier
21 today.
22 Q.        Okay. And at whose request was Mr.
23 Haupt evaluated by Dr. Wukich?
24 A.        I think it was his employer.
25           MR. DEEB: Objection.

86

1           THE VIDEOGRAPHER: Off the video
2  at 6:58.
3           (The following discussion was held
4  off the video record.)
5           MR. DEEB: The employer is not a
6  party to this case. The retention of his expert and
7  his testimony and anything with regard to what he
8  determined is thereby not relevant and not
9  appropriate to be admitted into evidence, either the
10 existence or the results of the examination or any
11 opinions based thereon.
12          MR. SLOAN: Again, I think that,
13 nonetheless, inference can be drawn from that, so I
14 think it is probative.
15          (Back on the video record.)
16          THE VIDEOGRAPHER: Back on the
17 video at 6:58.
18 BY MR. SLOAN:
19 Q.        Dr. Mauthe, it seems like a long time
20 ago when I told you I was going to ask you some
21 opinion questions and I asked you to base your
22 answers on your own knowledge of Mr. Haupt, your
23 review of the records, and the hypotheticals that I
24 would give you. If, doctor, I were to ask you now
25 to give answers to the very same opinion questions

87

1  but only base your answers on your own knowledge of
2  him and -- and your knowledge from the records and
3  to -- to disregard the hypotheticals, would your
4  answers to the opinion questions be the same?
5  A.        Yes.
6           MR. DEEB: Objection.
7           THE VIDEOGRAPHER: Off the video
8  at 6:59.
9           (The following discussion was held
10 off the video record.)
11          MR. DEEB: I think it's impossible
12 to ask the doctor to give his opinion now based upon
13 the way the hypotheticals were intertwined into the
14 questions that were asked him previously. That
15 being said, obviously the doctor can answer the
16 question.
17          (Back on the video record.)
18          THE VIDEOGRAPHER: And we are back
19 on the video at 6:59.
20          THE WITNESS: Yes.
21 BY MR. SLOAN:
22 Q.        That's your answer?
23 A.        That's correct.
24 Q.        Doctor, one last question, at least from
25 me. Have all the opinions that you've rendered here

88

1  today been based upon a reasonable degree of medical
2  certainty?
3  A.        Yes.
4           MR. SLOAN: Dr. Mauthe, thank you
5  very much. I will stop torturing you, but I'm sure
6  Mr. Deeb has a few questions for you.
7           THE WITNESS: Thank you.
8                    * * *
9           CROSS-EXAMINATION
10 BY MR. DEEB:
11 Q.        Hello, doctor.
12 A.        Yes, sir.
13 Q.        As -- as you're aware, my name is Peter
14 Deeb, and I represent the defendant in this matter,
15 Goodyear Tire & Rubber Company. I have a number of
16 exhibits that have been premarked by the court
17 reporter which I'll put here for the occasion in
18 which we may have to refer to them during some of
19 the questions that I have to ask you.
20          Doctor, you're here today
21 testifying on behalf of Mr. Haupt, correct?
22 A.        He's my patient, yes.
23 Q.        And I imagine, given your practice, that
24 you regularly testify on behalf of injured
25 plaintiffs in legal actions?